# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| VICKIE XIONG, | ) | 1:09-cv-00553 GSA |
| | ) | |
| | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## BACKGROUND

Plaintiff Vickie Xiong ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

///

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 10 & 11.

1

# FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed her application for supplemental security income on or about January 31, 2005. AR 26. The claim was denied initially on May 20, 2005, and upon reconsideration on March 15, 2007. AR 26-27. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") on or about April 17, 2007. AR 33. ALJ Bert C. Hoffman held a hearing on April 15, 2008. AR 527-554. On May 29, 2008, the ALJ issued an unfavorable decision denying benefits. AR 9-25. On December 2, 2008, the Appeals Council denied review. AR 3-5.

**Hearing Testimony**

ALJ Hoffman held a hearing on April 15, 2008 in Fresno, California. AR 527. Plaintiff was represented by Melissa Proudian. AR 527. Plaintiff and her mother, Hmai Yang ("Ms. Yang"), testified with the aid of an interpreter. AR 527.

   *A.   Testimony of Vickie Xiong*

During the hearing the ALJ asked Plaintiff to verify her Social Security Number, what language she spoke in, and who her teacher was. AR 529. When asked how old she was, Plaintiff responded that she was seven years old and has brothers and sisters at home. AR 530. She also responded that she was the youngest in her family. AR 530. The ALJ asked Plaintiff to speak up several times and Plaintiff responded with "Yes" to each command. AR 532. When asked if she had siblings Plaintiff responded "yes." AR 532. At the end of hearing the ALJ thanked Plaintiff for coming, and Plaintiff responded by saying "Bye." AR 553. No further testimony from Plaintiff was given. The majority of the testimony was given by Plaintiff's mother.

   *B.   Testimony of Ms. Yang*

Plaintiff is currently in second grade at Olmos Elementary School.[3] AR 109-114, 535. Plaintiff did not learn English until kindergarten. AR 553.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[3] It is unclear from the record where Olmos Elementary School is located.

During 2001, Plaintiff was exposed to lead when she was living in the family home in Milwaukee. AR 537. She was one and a half years old at the time. AR 537. Symptoms included paleness, bloated stomach and lethargy. AR 537.

Plaintiff was taken to a hospital and tests revealed her lead level was 215. AR 539. Plaintiff received an IV and was injected with several needles into her legs over 83 hours to reduce the amount of lead poisoning. AR 538. In addition, tubes were inserted into her nose and pills were taken. AR 541. This process was repeated several times. AR 541. Plaintiff was hospitalized for two weeks. AR 538. Plaintiff's mother was told the process would be lengthy because the lead got into Plaintiff's bones. AR 542. There were no side effects to the injections, but the pills might cause "black liver." AR 542. After the treatment, Plaintiff was told to return to the hospital every other week to receive an injection. AR 539. Plaintiff also received injections at home during the weeks she did not receive injections at the hospital. AR 539.

In October 2003, Plaintiff and her family moved to California and she received treatment at Valley Children's Hospital in Madera, California. AR 538, 540. Plaintiff was not hospitalized at Valley Children's, however, she was hospitalized at Kaweah Delta in Visalia, California in early 2004 for two days and two nights. AR 540, 541. The lead removal process in Milwaukee was not repeated at Kaweah Delta. AR 541. Plaintiff was never hospitalized again and her subsequent treatment was limited to medication. AR 540. However, she only took medication when her lead levels rose because one of the side effects of the medication was liver damage. AR 542. It has been more than a year since Plaintiff last took the pills. AR 542. Aside from black liver, side effects included loss of appetite, hyperactivity, loss of attention, and behavior problems. AR 543. Plaintiff's appetite still has not fully returned and she takes vitamins to ensure she receives the proper nutrients. AR 543.

Plaintiff received nursing visits while in Wisconsin and California. AR 543. The nurse analyzed Plaintiff's urine and provided Plaintiff's mother with dietary information to instruct Plaintiff on proper nutrition. AR 543. The urine tests were performed monthly for a duration of one to two years while Plaintiff resided in Wisconsin and California. AR 544. Plaintiff's urine is not currently tested. AR 544. The nurse also handled Plaintiff's injections and obtained

medication for Plaintiff when her temperature rose or she had headaches. AR 544. Plaintiff suffers from headaches two to three times a week. AR 544. She takes Tylenol to alleviate the pain, however, the headaches often recur within two or three days. AR 545. No medication other than Tylenol is used to combat the headaches. AR 545.

Plaintiff also has difficulty walking due to pain in her leg bones. AR 545. Plaintiff is carried around by her mother when this occurs. AR 545. To ease the pain, Plaintiff's mother gives Plaintiff Tylenol and massages her legs for ten minutes while the pain dissipates. AR 547.

The lead poisoning also causes Plaintiff to have seizures, during which time she foams at the mouth. AR 545. The seizures occur once every one to two weeks, lasting from two to three minutes, after which time Plaintiff feels normal again. AR 547. The seizures have no side effects other than leaving the Plaintiff "very tired" for two to three hours. AR 547-548. Plaintiff received treatment at Valley Children's Hospital for the seizures, but was not prescribed mediation because the adverse side effects would outweigh the benefits. AR 548.

Plaintiff's mother stated Plaintiff was "not very smart like [her] other children" because Plaintiff did not "learn well and she does not function as well"as her siblings. AR 549. Plaintiff is unable to perform tasks when asked to do so. AR 549. For example, Plaintiff is unable to "straighten places," brush her teeth, or eat properly. AR 549. Plaintiff's siblings are able to perform these tasks with no problems. AR 549.

In kindergarten, Plaintiff's teacher noted Plaintiff had learning problems and difficulty performing arithmetic, and recommended that Plaintiff repeat the grade. AR 549. Plaintiff's mother did not agree to have Plaintiff retained. AR 549. However, as Plaintiff proceeded through her schooling, Plaintiff's mother expressed concern that Plaintiff may not pass second grade. AR 535. Lastly, Plaintiff's mother was told by physicians that Plaintiff will continue to have problems in her adult years. AR 550.

///
///
///
///

**Medical Record**

### A.  *Public Health Nurse Lillarose Bangs*

On November 4, 2002, a PHN Lead Referral sheet from Public Health Nurse Lillarose Bangs noted that Plaintiff's blood lead level ("BLL") decreased from 215 to 50. AR 340. Plaintiff received chelation therapy several times. AR 340. On January 14, 2005, Nurse Bangs reported that Plaintiff's BLL was at 44.5. AR 265. She visited Plaintiff's home where Plaintiff's mother informed her that Plaintiff was still having small seizures, not eating correctly, and complained of her bones hurting. AR 265.

In a letter dated November 9, 2006, Nurse Bangs stated the chelation procedure put a toll on the Plaintiff's body. AR 128. In addition, Plaintiff continued to have seizures, learning difficulties, problems sleeping and headaches. In a letter dated November 15, 2006, Nurse Bangs reported Plaintiff had been chelated approximately thirteen times. AR 248. Bangs stated that lead poisoning leads to severe permanent neurological damage in young children, impacting their reading and learning abilities, speech and language capabilities, and can cause mental retardation. AR 248. Plaintiff's symptoms include headaches, irritability, and abdominal pain which is consistent with lead poisoning AR 248. She also noted Plaintiff suffers from lack of sleep and suffers continuously from abrupt seizures. AR 248.

### B.  *2005 Function Report*

On January 31, 2005, a Function Report was completed by Plaintiff's mother. AR 82-89. She noted that Plaintiff was not totally unable to speak; however, she had problems speaking clearly. AR 84. Plaintiff's speech could hardly be understood even by people who knew her well. AR 84. Plaintiff's mother noted Plaintiff's ability to communicate was limited. AR 85. Plaintiff was able to use complete sentences of more than four words most of the time, able to talk about what she was doing, and able to ask for what she wanted. AR 85. Plaintiff's mother reported Plaintiff's ability to communicate was limited. AR 85. Specifically, Plaintiff cannot ask many "what, why, and where" questions or take part in conversations with other children. AR 85. In addition, Plaintiff is unable to talk about activities that happened in the past and cannot tell familiar childhood stories, or answer questions about them. AR 85. Plaintiff cannot

deliver simple messages such as telephone messages; however, she could recite numbers up to three, and knew her age. AR 86. Plaintiff could not count three objects (like blocks, cars or dolls), could not recite numbers to ten, could not identify most colors, did not know her own birthday, did not know her own phone number, could not define common words or read capital letters of the alphabet, and could not understand jokes. AR 86.

Plaintiff's mother also reported Plaintiff's physical abilities were limited; however, she was able to catch a large ball and could use scissors very well. AR 87. Plaintiff was affectionate toward parents and enjoyed being with other same-aged children. AR 87. Plaintiff also shared toys, took turns, and played "pretend" with other children. AR 87. Plaintiff was reported to control her bowels and bladder during the day, and eat using a fork and spoon by herself. AR 88. Plaintiff could not dress herself with or without help, could not wash or bathe herself without help, and could not brush her teeth with or without help. AR 88. Plaintiff was able to pay attention and stick with tasks. AR 88.

### C.     Dr. Ralph Diaz

On April 13, 2005, Dr. Ralph Diaz, a consulting, board certified pediatrician at Valley Health Resources in Fresno, California examined Plaintiff. AR 203-205. He noted Plaintiff's past history included a diagnosis of lead poisoning in 2002, and hospitalization in Milwaukee for five days every other week for eight weeks. AR 203. Plaintiff was hospitalized in 2004 for five days secondary to lead poisoning. AR 203. Her BLL levels were normal. AR 203. Dr. Diaz determined that Plaintiff had full range of motion and no neurological damage to her cranial nerves and reflexes. AR 205. Also, there was no gross sensory or motor deficits. AR 205. Plaintiff was able to dress without help. AR 205. Dr. Diaz concluded Plaintiff was severely lead poisoned, noting a possibility of decreased cognitive ability. AR 205. Plaintiff was six to eight months delayed in language and fine motor skills and had appropriate gross motor and social skills. AR 205. Dr. Diaz stated it was difficult to ascertain what the patient's future cognitive ability will be in terms of output. AR 205. There was no disorganization of motor function, no neurological abnormalities, and gait was normal. AR 205. Response to stimuli was

approximately six months delayed secondary to language delay. AR 205. There was a six month delay in cognitive ability. AR 205.

### D. Dr. Richard Engeln

On April 15, 2005, Plaintiff underwent a psychological evaluation by Dr. Richard Engeln, Ph.D., a clinical psychologist. AR 198-202. Dr. Engeln stated Plaintiff seemed to speak well, but spoke in sentences or answered questions only when she wanted to. AR 200. Plaintiff was "slow-to-warm" up and was reluctant to attempt tasks. AR 200. Plaintiff's responses to questions involved whispering the answer to her mother who then relayed the answers to the doctor. AR 200. Plaintiff's responses to figure drawing tasks were generally scribbling. AR 200. Plaintiff was cooperative when asked to point to objects or select an object out of a group of four. AR 200. Plaintiff did not respond to auditory queries. AR 200. Plaintiff's mother stated she could respond to the tasks given, but Plaintiff was very controlling about her answers. AR 200. Plaintiff's Bender-Gestalt II score was 84, low average, but the test's demands of children at Plaintiff's age level are very low. AR 200. On the TONI III, a visual matching and reasoning task, Plaintiff scored 85, low average, when compared to a normative age of six years. AR 200. All formal measurements of abilities, including Stanford-Binet, were in the moderate range of mental retardation. AR 200-201. Plaintiff's Vineland Adaptive Behavior Scale scores showed mild range of mental retardation and borderline mental retardation. AR 201. Despite Plaintiff's mother's claims, there was no evidence of any attention deficit, and no evidence of any expansive behavior. AR 201. Dr. Engeln concluded that it is not clear Plaintiff has a language disorder or any real developmental disorder. AR 202. He recommended placing Plaintiff in regular kindergarten. AR 202.

### E. Physical Therapy Developmental Evaluation

Plaintiff was seen on April 12, 2005 at Children's Hospital Central California where she underwent a physical therapy developmental evaluation. AR 142-147. Range of motion was normal with some slight joint laxity with hyperextension at her knees. AR 144. Plaintiff walked intermittently on the dorsal aspects of her toes. AR 144. Plaintiff demonstrated normal strength and motor control. AR 144. Reaction and reflexes were also normal. AR 144. Plaintiff failed

to perform several physical tasks. AR 144. However, it was difficult to determine whether Plaintiff was capable of these activities because she was reluctant to try or did not understand. AR 144. Gait was normal. AR 144. Play skills were somewhat limited and Plaintiff had poor verbal skills, but no physical therapy was recommended. AR 146.

### F.   Drs. Sadda Reddy and Evangeline Murillo

Plaintiff's records were reviewed by Dr. Sadda Reddy, a state agency, non-examining physician, and Dr. Evangeline Murillo, a state agency non-examining psychiatrist on or around May 9, 2005. AR 115-120. They noted Plaintiff suffered from severe impairments. AR 115. With regard to the six domains of functioning, Plaintiff scored "no limitation" in the domains of attending and completing tasks, interacting and relating to others, moving about and manipulating objects, and caring for yourself. AR 117-118. Plaintiff scored "less than marked" in acquiring and using information and health and physical well-being. AR 117-118. Drs. Reddy and Murillo relied on information given by Plaintiff's mother in the Function Report for their evaluations. AR 117-118. In a Disability Determination Rationale dated May 9, 2005, Dr. Reddy opined Plaintiff does not meet, or functionally equal any listing. AR 196-197. In a Disability Determination Rationale dated May 11, 2005, Dr. Murillo opined Plaintiff should be placed in regular kindergarten. AR 194-195.

### G.   Drs. Patrice Solomon and Andre Chabot

On June 6, 2005, Dr. Patrice Solomon, evaluated Drs. Reddy's and Murillo's evaluation of Plaintiff, and agreed with their findings. AR 124-126. On the same date, Dr. Andre Chabot reviewed Reddy's and Murillo's evaluation and agreed with their findings. AR 121-123.

### H.   Dr. Jane Donat

On June 28, 2005, Plaintiff was seen in the Neurology Clinic at Children's Hospital Central California where she was examined by Dr. Jane Donat. AR 148-149. Dr. Donat noted Plaintiff's blood level was staying in the 40's and she had not taken a chelation agent in some time. AR 148. Plaintiff's BLL was decreasing due to her lack of continuous exposure to lead. AR 148. Plaintiff appeared to have a seizure disorder with generalized tonic-clonic seizures occurring on a monthly basis. AR 148. However, the seizures are brief and self-limited. AR

148. Dr. Donat agreed with Plaintiff's mother that no chronic anti-convulsant medication would be given because the potential side-effects would outweigh their benefit. AR 148-149. Plaintiff's mother brought up Plaintiff's hyperactivity, short attention span and distractibility. AR 148. There was some indistinctness in speech found, however, it was not anticipated that Plaintiff would get special help in kindergarten. AR 148.

### I.     Other Records

An Individual Student Learning Plan dated February 28, 2006 noted Plaintiff was at risk of retention, but would be promoted. AR 524. Plaintiff would attend extended days one to two days per week. AR 524. Plaintiff's Grade One Assessment noted Plaintiff needed to increase reading speed and comprehension.[4] AR 522. A Developmental Flow Sheet noted mild delays in dressing herself without help, and giving her own address.[5] AR 246. Plaintiff had a moderate delay in giving her own phone number. AR 246. No other child developmental skills were noted. AR 246. On April 4, 2008, Plaintiff's second grade teacher stated Plaintiff was "low in academic areas" and is very quiet in class to the point where the teacher could barely hear her. AR 109.

On December 19, 2006, Plaintiff's BLL had improved to 27.5. AR 378. On April 6, 2007, Plaintiff's BLL was considered "stable" at 31.6. AR 372. Plaintiff's BLL had also improved to 27.3 on May 9, 2007. AR 371. BLL's fluctuated as time went on (AR 369, 368, 364, 360), but a recent blood test on February 29, 2008 showed Plaintiff's BLL had dropped to 23.7, and was considered stable. AR 514.

Subsequent follow-up examinations throughout 2005 to 2008 showed nothing remarkable except treatment for other conditions. AR 180, 185, 214, 375-376, 379. No medications were being taken as of February 1, 2005. AR 190, 193, 214. Possible seizure disorder was noted on June 6, 2005 and April 5, 2005. AR 187, 191. Plaintiff had no complaints throughout the series

---

[4] This form is not dated.

[5] This form is not dated.

of clinical visits. AR 188, 185, 370, 373. During the closed period of disability there was only one complaint of a headache. AR 183.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

**Child Disability Standard**

The childhood disability standard was changed by the Personal Responsibility and Work Opportunity Act of 1996. *Pub. L. No. 104-193, § 211, 110 Stat. 2105 (1996)*, amending 42 U.S.C. § 1382c(a)(3)(A*).* The amendment provides:

> [A]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked or severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.
> 42 U.S.C. § 1382c(a)(3)(C)(i).

10

To apply the new statutory standard, the Commissioner now uses a three-step sequential evaluation procedure for determining whether a child's impairments result in marked and severe functional limitations and is therefore disabled. 20 C.F.R. § 416.924(b)-(d). The amendment eliminated the fourth step in the disability analysis: determining whether the child had an impairment or impairments of comparable severity to that which would disable an adult. This new standard applies to new claims filed on or after August 22, 1996, and to new claims not yet finally adjudicated on that date. 42 U.S.C. § 1382c. A claim is not finally adjudicated if an administrative or judicial appeal was pending on or after that date regarding a claim that has been denied in whole. *Id.; see Jamerson v. Chater*, 112 F.3d 1064, 1065 n.1 (9th Cir. 1997).

The relevant inquiry at step one is whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If not, step two requires the fact finder to determine whether the child has a medically severe impairment or combination of impairments. 20 C.F.R. § 416.924(c). Plaintiff bears the burden of demonstrating a severe impairment. 20 C.F.R. § 416.924. If the impairment is a "slight abnormality or a combination of slight abnormalities that cause no more than a minimal functional limitation," the Commissioner will find that the child does not have a severe impairment and therefore is not disabled. 20 C.F.R. § 416.924(c).

Step three requires determining whether the severe impairment meets or equals in severity any impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d). If such an impairment exists, the Commissioner must find the child disabled. *Id.* If the child's impairment does not meet or medically equal any listing, then the Commissioner must determine if the limitations caused by the impairment functionally equal a listing in the Listing of Impairments. *Id.* To do so, the Commissioner will assess all of the functional limitations caused by the child's impairments in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for self; and (6) health and physical well being. *See* 20 C.F.R. § 416.926a(a)-(b). To functionally equal a listing, the impairments must result in marked limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).

11

A.     *The ALJ's Findings*

Applying the steps in this case, the ALJ found that: (1) Plaintiff did not engage in any substantial gainful activity because she was five years old at the time of filing her claim, and has never engaged in any substantial gainful activity during the period of disability from January 31, 2005 to April 9, 2007;[6] (AR 15); (2) Plaintiff had a medically severe impairment because she had a history of lead poisoning, mild developmental delay, and a history of seizure disorder (AR 15); and (3) Plaintiff had "less than marked" evaluations for four of the six domains of functioning: acquiring and using information, attending and completing tasks, moving about and manipulating objects, and health and physical well-being.  AR 20-24.  Plaintiff had "no limitation" evaluations for interacting and relating with others, and caring for herself.  AR 21-23.  Therefore, the ALJ determined that Plaintiff was not disabled pursuant to the Social Security Act.

## DISCUSSION

Plaintiff contends the ALJ erred in rejecting Plaintiff's testimony and the testimony of her mother.  Doc. 17 at 4.

A.     *Plaintiff's Testimony*

Plaintiff argues that the ALJ improperly assessed her subjective symptom testimony. Doc. 17 at 4.  As the Defendant points out, the Plaintiff gave very little testimony during the interview with the ALJ, and what she did say was limited to pleasantries between the ALJ and herself.  AR 529-532, 553.  Defendant argues that Plaintiff's testimony was not rejected.  Doc. 20 at 5.

In his findings, the ALJ noted that Plaintiff did testify at the hearing.  AR 12.  However, only the statements of the Plaintiff's mother were mentioned in determining inconsistencies between Plaintiff's symptoms and the impairments.  AR 17.

It is true that "[s]o long as the [ALJ] makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir.

---

[6] At the outset of the hearing, Plaintiff's counsel requested a closed period of disability from January 31, 2005 to April 9, 2007.  AR 531.  The ALJ granted counsel's request.  AR 531.

12

1991). However, where the ALJ fails to articulate reasons for believing or disbelieving a claimant's testimony, it is deemed credible as a matter of law. *See Varney v. Secretary of Health and Human Services*, 859 F.2d 1396, 1398 (9th Cir. 1988) (citing *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987); *Ceguerra v. Secretary of Health & Human Services*, 933 F.2d 735, 740-41 (9th Cir. 1991). *See also Ware on Behalf of Ware*, 902 F.Supp. 1262, 1273 (E.D. Wash. 1995) (Mother's testimony on behalf of her son was credited as true because the ALJ made no credibility finding as to the mother's testimony).

Here, there is no testimony by which an ALJ could extract ample descriptions of Plaintiff's symptoms because Plaintiff's testimony was limited to mere pleasantries. AR 529-532, 553. The vast majority of the hearing transcript revolves around Plaintiff's mother. Whatever testimony Plaintiff gave is credited as true and is not dispositive on any issue in this matter. In short, the ALJ cannot discount testimony that was never given and what testimony remains is *de minimis*.

### B.      Lay Opinion Testimony

Plaintiff argues that the ALJ does not offer any legally sufficient reasons to reject the testimony of Plaintiff's mother. Specifically, Plaintiff argues the ALJ's decision is improper because his rejection of Ms. Yang's testimony is based on the fact that the objective medical evidence did not support the level of limitation she describes.

As a preliminary matter, Plaintiff has argued that the ALJ must offer clear and convincing reasons for rejecting the testimony of Plaintiff's mother. Doc. 17 at 6-7. This is an incorrect statement of the law. Judges may, "in addition to evidence from acceptable medical sources . . ., also use evidence from other sources to show the severity of [plaintiff's] impairment(s) and how it affects [her] ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d). Such other sources include spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy. See 20 C.F.R.§§ 404.1513(d)(4), 416.913(d)(4). Lay witness testimony by family members and friends who have the opportunity to observe plaintiff on a daily basis "constitutes qualified evidence" that the ALJ must consider. *Sprague v. Brown*, 812 F.2d 1226, 1231-32 (9th Cir. 1987); see *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993) ("An eyewitness can often tell

whether someone is suffering or merely malingering. While this is particularly true of witnesses who view the claimant on a daily basis, the testimony of those who see the claimant less often still carries some weight"). To reject lay testimony, an ALJ must give reasons "germane to each witness" for doing so. *Dodrill v. Shalala*, 12 F.3d at 919. Thus, the ALJ must give germane reasons for rejecting Ms. Yang's testimony.

With regard to Plaintiff's mother's credibility, the ALJ notes the following:

> After considering the evidence of record, I find the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of the claimant's are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below . . .
> AR 16-17.

To support this conclusion, the ALJ provides a very detailed analysis of all of the medical records including doctor and hospital reports, lab results, psychological and physical therapy evaluations, as well as teacher/learning assessments. AR 19-24. An ALJ cannot discredit a lay person's testimony just because he finds that it is "not supported by medical evidence in the record." *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996)). In this case, however, the ALJ also relied on parts of a function report filled out by Plaintiff's mother, as well as Plaintiff's teachers' and physical therapists' reports assessing Plaintiff's physical, educational, and social abilities. AR 16-19. This is illustrated throughout the ALJ's findings.

1. *Acquiring and Using Information*

Plaintiff's mother testified that she was concerned about her daughter's mental development. AR 549. However, the ALJ credited the Function Report and Plaintiff's second grade teacher in determining the limitations were less than marked. AR 20. Specifically, the ALJ relied on the Function Report in finding Plaintiff can communicate in complete sentences, and recite numbers to three. AR 20, 85, 86. Plaintiff's second grade teacher reported Plaintiff was "low" in academic areas, and had a "mild" problem learning new skills and keeping up with peers. AR 20, 109, 113. Dr. Diaz noted a six month delay in cognitive and language abilities,

but was unsure about her future cognitive abilities. AR 20, 205. However, as the ALJ concluded, "at the age of [four] years and [ten] months, [Plaintiff] was functioning above [two-thirds] of chronological age. Accordingly, the limitations in this domain were less than marked." AR 20. The ALJ's conclusions are consistent with the findings of the four state agency physicians who opined Plaintiff had less than marked limitations in this area. AR 117-118, 121-126.

    2.    *Attending and Completing Tasks*

According to Plaintiff's mother, Plaintiff is unable to perform tasks when asked to do so. AR 549. For example, Plaintiff is unable to "straighten places," brush her teeth, or eat properly. AR 549. However, the ALJ determined that Plaintiff's ability to attend and complete tasks was "less than marked." AR 21. Per the Function Report, the ALJ concluded Plaintiff has the ability to pay attention and stick with tasks. AR 21, 88. Plaintiff's second grade teacher noted Plaintiff is able to finish "things she starts, listening and remaining attentive, organizing and concentrating on her schoolwork, and sticking to a play activity." AR 21, 114. The teacher stated Plaintiff has a mild problem in learning new skills and keeping up with her peers. AR 21, 113. The ALJ also considered Dr. Diaz's conclusion that Plaintiff had a six month delay in cognitive and language abilities in addition to her six month delay in responses to stimuli. AR 21, 205.

The ALJ's findings are supported by Dr. Engeln, who opined there was no evidence of attention deficit or expansive behavior. AR 201. The ALJ's findings also match the conclusions of the four state agency physicians, who felt that Plaintiff had less than marked limitations in this area. AR 117, 121-126.

    3.    *Interacting and Relating with Others*

The ALJ concluded the Plaintiff had no limitations in this area. AR 22. The ALJ credited Plaintiff's mother's testimony in the Function Report when she stated Plaintiff enjoyed being with the same-aged children, showed affection towards them and parents. AR 22, 87. The ALJ also cites Plaintiff's second grade teacher who felt Plaintiff was very quiet in class, and could barely be heard when called on. AR 22, 109. However, "if heard, she can be understood." AR 22, 112.

The ALJ's conclusions are in accord with those of the four state agency physicians, and Dr. Donat who opined Plaintiff's speech did not require any special help in kindergarten. AR 24, 117, 121-126, 148.

4. *Moving About and Manipulating Objects*

Per the Function Report, the ALJ credited Plaintiff's mother testimony wherein she stated Plaintiff could catch a large ball, and use scissors "fairly well." AR 22, 87. The ALJ cited the Physical Therapy Developmental Evaluation which observed Plaintiff's gait was normal. AR 22, 144. Dr. Diaz concluded that Plaintiff was six to eight months delayed in language and fine motor skills. AR 22, 205. This conclusion deviates from those of the four state agency physicians who opined that Plaintiff had no limitations in this area. AR 118, 121-126. Nevertheless, the ALJ concluded Plaintiff had less than marked limitations in this area. AR 22.

5. *Caring for Yourself*

Plaintiff's mother feels that Plaintiff's ability to brush her teeth and get dressed are diminished. AR 549. Specifically, in the Function Report, Plaintiff's mother stated Plaintiff could not dress her herself with or without help. AR 88. However, the ALJ held that Plaintiff had no limitations in this area because, "[p]er the Function Report, [Plaintiff] is able to eat using [a] fork and spoon by [herself]." AR 23, 88. In addition, the ALJ cited Dr. Diaz, who opined Plaintiff could dress herself. AR 23, 205. Based on the Function Report, the four state agency physicians concluded Plaintiff had no limitations in this area. AR 118, 121-126. The ALJ's conclusions are consistent with their findings. AR 23.

6. *Health and Physical Well-Being*

Plaintiff's mother testified that lead poisoning gave Plaintiff headaches which are treated with Tylenol. AR 544-545. In addition, the lead poisoning is responsible for Plaintiff's seizures which lasted two to three minutes and caused fatigue for two to three hours. AR 547-548.

The ALJ noted that Plaintiff has a history of lead toxicity; however, "she has not needed to take a chelation agent (succimer) for some time, and her lead blood level had continued to decline." AR 24. This is consistent with Dr. Donat's findings who opined Plaintiff's BLL's were dropping because she was no longer exposed to lead. AR 148.

1    In addition, the ALJ noted Plaintiff's mother testimony concerning the seizures, but found
2 they were not particularly bothersome, that Plaintiff does not take any medication to treat them
3 and has not required any hospital or emergency care. AR 24. This is also consistent with Dr.
4 Donat's opinion that the seizures posed no danger because they were brief and self-limited. AR
5 148-149.
6    As for the headaches, the ALJ stated they "do not cause significant limitation of function
7 and there were no adverse side effects associated with the use of Tylenol." AR 24. To support
8 this conclusion, the ALJ cited Plaintiff's second grade teacher who noted no complaints of
9 headaches. AR 24, 109-114. Furthermore, the teacher noted no excessive absenteeism. AR 24,
10 113. The ALJ's conclusion is supported by the medical record where there was only one
11 complaint of a headache within the closed period of disability. AR 24, 183.
12    The ALJ also cited Drs. Reddy and Murillo who opined Plaintiff has a history of iron
13 deficiency but no anemia or growth impairments. AR 24, 120. All four state agency physicians
14 opined Plaintiff had less than marked limitations in this area, noting elevated lead levels;
15 however, Plaintiff's physical exam was normal. AR 118, 121-126.
16    Based on the above, the ALJ properly relied upon other factors in conjunction with the
17 objective medical evidence.. An ALJ is permitted to discount lay testimony to the extent it is
18 inconsistent with medical evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005)
19 ("Inconsistency with medical evidence is [a germane reason to discredit the testimony of lay
20 witnesses]"). Here, the ALJ properly rejected portions of the Plaintiff's mother's testimony
21 because it was inconsistent with the medical evidence and other information contained within the
22 record.
23    Finally, Plaintiff cites to boilerplate law and makes a conclusory statement that if Ms.
24 Yang's testimony was credited as true, Plaintiff would be disabled under the Act. However,
25 Plaintiff has not cited to one aspect of Ms. Yang's testimony or specifically identified how this
26 testimony would have altered the ALJ's finding in any of the six domains. Therefore, the Court
27 is not persuaded that the ALJ did not provide germane reasons for rejecting some portions of Ms.
28 Yang's testimony, or that his reliance on the evidence in the medical record and information from

other sources was improper. Plaintiff correctly points out that a person does not have to be completely incapacitated to be entitled to social security benefits. *See Smolen v. Chater*, 80 F.3d at 1284 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment . . ."); *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (noting that a disability claimant need not "vegetate in a dark room" in order to be deemed eligible for benefits). However, in this case, the ALJ generally credited Ms. Yang's testimony, but as explained above, rejected it when objective medical evidence and assessments from Plaintiff's teachers and therapists contradicted Ms. Yang's perceptions regarding the six domains. As a result, the ALJ provided germane reasons for rejecting portions of Ms. Yang's testimony and the decision is supported by substantial evidence.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Vickie Xiong.

IT IS SO ORDERED.

Dated:   **June 25, 2010**              /s/ **Gary S. Austin**
                                       UNITED STATES MAGISTRATE JUDGE